[No. 32297. Department Two. July 2, 1953.]

ANGELES GRAVEL & SUPPLY COMPANY, *Respondent*, v. CLAL-
LAM COUNTY HOSPITAL DISTRICT NO. 2 *et al.*, *Appellants*.[1]

*Riddell, Riddell & Williams*, for appellants.

*Dana E. Harper*, for respondent.

FINLEY, J.—In this lawsuit the plaintiff, Angeles Gravel
and Supply Company, sued the defendant J. G. Watts Con-
struction Co. for the sum of $3,595.18, alleging that the sum
represented a balance due for mixed concrete delivered to
the construction company for use by it in the erection of
the Olympic Memorial Hospital in Port Angeles, Washing-

[1] Reported in 259 P. (2d) 366.

ton. The building contractor's bonding company was made a party defendant, as well as the Clallam County Hospital District No. 2, for which the hospital was being built. After the complaint was filed, the contractor made a payment on account in the sum of $1,661.33, under an agreement that such payment would not affect the right of the plaintiff to proceed with its lawsuit. The defendants contended that there were shortages in the deliveries of mixed concrete by the plaintiff. It is further contended by the defendants that timely complaint was made respecting the shortages. The plaintiff denied that there were shortages and that timely complaint was made by the defendants, and furthermore, urged that defendants were estopped to assert any claim of shortage. The trial court awarded judgment for the plaintiff, stating that his decision was on the theory of estoppel or waiver, and this appeal followed.

First, we note that the construction company concedes that all of its assignments of error are predicated on the single issue of whether there were shortages in the deliveries of mixed concrete by the plaintiff. The trial court made no specific finding as to whether or not there were shortages, and no finding as to the specific number of yards of concrete delivered. No assignment of error *specifically* emphasizes the absence of a finding of fact on the latter mentioned aspects of the case. Apparently, this is because the trial court's decision turned on the question of estoppel rather than on the issue of shortages.

The facts, as we see them, are as follows: The construction company held a contract with the Clallam County Hospital District No. 2 for the erection of the Olympic Memorial Hospital in Port Angeles, Washington, pursuant to which a subcontract was entered into with the Angeles Gravel & Supply Company for mixed concrete. The initial order was for 8,000 yards, but subsequently was reduced to 3,000 yards. The actual amount delivered was 2,381 yards. After 1,750 yards of mixed concrete had been delivered, the construction company wrote a letter to plaintiff on January 5, 1951, which, in part, read as follows:

"In reviewing our records it has become apparent that throughout our pours we are continually being shorted in volume of concrete in an amount totaling approximately eight per cent. To date we have poured approximately 1750 yards and are 125 yards over our estimate. . . .

"Upon checking with your plant the total weight of sand and gravel now being used amounted to 3305 lbs. per c.y. . . . It has been our experience in operating our own batch plant that to obtain a full yard of concrete by volume the weight of the concrete must equal approximately 3600 lbs. . . ."

Upon receipt of the above quoted letter, Mr. A. E. Nailor, the cement company's manager, checked the scales used at the mixing plant, and also checked with the workmen in charge of the mixing operations. He talked with the construction company's foremen on the hospital job. Mr. Nailor testified as follows:

"Q When you had this complaint of the shortage made what did you do about it? A I went up to see the foreman. [Jack Clark was foreman on this job until January 18, 1951.] . . . He maintained that we were short and I said we weren't short. It's pretty hard to argue a thing out after it's poured."

When questioned as to whether Jack Clark (foreman for the construction company during part of the job) had stated that he was satisfied about the delivery of mixed concrete, Mr. Nailor said:

"A Yes and no. When this argument came up Jack couldn't understand it. He said he thought it was all right, but Watts wasn't satisfied with it. . . . when I talked to him [Clark] he would seem to agree with me and when Watts was there he agreed with Watts. It was pretty hard to pin him down one way or the other."

Nailor's testimony concerning his conversation with John Shelman, the foreman who succeeded Mr. Clark, was:

"A I talked to Mr. Shelman. Clark was there until February or March and then Shelman came down and I went up to meet him. Of course, he knew we were theoretically shorting him. The first pour he made he was rather indignant and said we had shorted him and evidently we had been shorting him right along and we checked the pour

and found he made a wrong measurement. It checked out all right. Before he left I asked him what he thought about it and he said he had poured approximately 500 yards since he was there and it checked out very fine."

On April 20, 1951, Mr. Nailor wrote the construction company a letter, reading in part as follows:

"We were surprised to receive your letter of April 11 concerning the concrete for the Memorial Hospital, as our understanding with Jack Clark before he left was that he believed the situation had been cleared up, and that you were satisfied no shortage existed.

"We have checked our Plant since our talk with you in January, and also checked with other contractors, and we are positive we are giving a little over, rather than short measure. We have also checked with your men in charge at the job, and they have told us the small pours checked out correctly, but that the large pours were short. This doesn't make sense. All our concrete is made in the same machine, using the same scales, and by the same mixerman. And we certainly cannot be held responsible for the manner in which the concrete is placed after it is delivered to the job.

"We have made every effort to cooperate with your men on this job and to give you the best service possible, and hope that we may continue to do so. However, since we are absolutely sure that our measure is correct, we would appreciate a check in full of your account at once, . . ."

After the construction company raised the question of shortages, and after some discussion of the matter between Mr. Nailor and the foremen for the construction company on the hospital job, the construction company, without making them subject to protest, made payments on account as follows:

| | |
|---|---|
| Jan. 11, 1951 | $4,680.51 |
| Feb. 10, 1951 | 1,273.33 |
| Feb. 12, 1951 | 5.75 |
| Mar. 12, 1951 | 3,086.77 |

After the payment of March 12, 1951, of $3,086.77, the balance due on the account with the cement company was only $115.00. Thereafter, delivery of mixed cement was continued. No further payments on account were made; after the construction was completed, the cement company sued for the alleged contract price of the mixed concrete,

apparently delivered after March 1, 1951. The trial judge's memorandum opinion reads, in part, as follows:

"The situation we have here is this: The testimony of Mr. Nailor and the mixer man and the truck driver who definitely and positively say that they are there when every yard of this concrete was mixed and it mixed a full yard which checked on the truck and a full yard was furnished. They testified to that as a fact. . . . The hospital was being built within a few blocks of the plant furnishing all of this concrete. It would be a simple matter to have gone down to the plant of the gravel company any time and checked that yardage and if they weren't getting that yardage, then and then alone was the time for remedy. What did the company do? The company, after 90 per cent, approximately, of this concrete was delivered in March, 1951 paid on this bill a check of $3086.77, leaving a balance at that time of $115.00 although they knew they had had an argument as to whether or not they were getting the volume that they were paying for and were billed for. . . . Isn't it kind of late to come in now and claim a credit and a law suit on that shortage, if there was a shortage? I don't know whether there was or not. I have no way of telling and I don't think anybody else in the world knows. There was testimony of wastage. I don't know how much wastage there was. Three employees come in here—two of the cement finishers came in and testified they had never seen so much wastage on a job in their life. More than they had ever seen on any other job. . . . The building of these forms if it varied one quarter or half an inch in the width of them could account for considerable concrete. . . . There were marks on their [plaintiff's] trucks which they were familiar with. Marks they had measured yardage over a period of years. The formula [based on the Pioneer Chart] had been in use for years and now because a new formula comes out and they come in, after having paid to within $115.00, not under protest, without any right to raise this question. *They are estopped to raise any question of shortage.* . . . *They have signed receipts for every yard that was delivered.* . . . It is entirely too late now to raise the question assuming that there was a shortage, and I am not at all convinced." (Italics ours.)

In the absence of a specific finding of fact as to whether or not there were shortages, and in the absence of an assignment of error specifically directed at this aspect of

the matter, we refer to the trial court's memorandum decision, quoted, in part, above. *Payne v. Vinecore*, 40 Wn. (2d) 746, 246 P. (2d) 448.

It is apparent from the above quotation that the decision of the trial court, adverse to the contentions of the construction company, was based upon the theory of an estoppel or waiver. At the trial, and in the appellate briefs of the parties, considerable attention was given to the question of alleged shortages in the delivery of mixed cement. In view of the basis of the trial court's decision, as indicated above, which we think was sound, it is not necessary to discuss the question of whether there were shortages in the delivery of mixed cement. We are convinced that the facts in this case justify an application of the theory of a discharge by voluntary acceptance of a defective performance, and that the trial court's decision must be sustained. See 5 Corbin on Contracts 984, § 1245.

In 113 A. L. R. 684, the following statement is found in the annotation:

"By the weight of authority the rule is recognized that where a buyer has knowledge, or an opportunity to acquire knowledge, of a deficiency in the quantity of goods delivered under a contract of sale of a designated quantity, and *fails to verify* such quantity and to notify the seller promptly of any shortage, or otherwise object on that account, he will be deemed to have waived it and will be estopped to set it up to defeat the seller's right to recover for the alleged deficiency, and *if he has paid for the full quantity contracted he will not be permitted to recover back from the seller on account of such deficiency part of the consideration paid, especially if the seller has thereby lost his opportunity to verify the fact of the shortage or trace it or account for it.*" (Italics ours.)

A reading of the cases cited in the annotation shows that the courts, in adhering to this general rule, are motivated by considerations of fair dealing between the parties and the necessity of the party claiming a shortage to establish it in time so that the defective performance can be remedied. Under the circumstances of this case, we are of the opinion that the rule just referred to is applicable to the case at bar,

despite the fact that appellant here did make some protests as to alleged shortages. A mere protest of shortage, not verified and established at a time when it would have been possible to correct the error, is not a sufficient compliance with the buyer's duty that he actually verify the shortage before he can defeat the seller's right to recover the full quantities receipted for. Fair dealing, the basis of the rule referred to, requires that the buyer do more than make somewhat rather vague objections, especially where, as here, the means were readily available for determining the alleged shortage and there was ample opportunity to do so and to make specific demands of respondent.

In arriving at our decision, we emphasize the following particulars: No very positive complaints, representations, or demands seem to have been made by the construction company while the pouring of the concrete was still in progress, nor until some time thereafter. There seems to have been no careful effort to verify possible shortages until after the construction work was completed. Delivery slips, showing the receipt of mixed concrete, were uniformly signed by representatives of the construction company, without noting any protest or claim of shortage. On March 1, 1951, the construction company paid the cement company all but a small balance of $115, ostensibly covering the mixed concrete delivered up to the indicated date.

The judgment of the trial court is affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.